**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF PUERTO RICO**

**OSIRIS SOTO,**

**Plaintiff,**

**v.**                                                   **CIVIL NO. 13-1507 (GAG)**

**JOHN M. McHUGH, et al.,**

**Defendants.**

## OPINION AND ORDER

Osiris Soto ("Plaintiff") brings this action against John H. McHugh, the Department of the Army, and ABC Insurance Company, Inc. ("Defendants"), alleging sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§2000e et seq. (See Docket No. 13.)

In a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(1) and 12(b)(6), Defendants argue certain claims should be dismissed for failure to exhaust administrative remedies, and that Plaintiff's claim for punitive damages is barred by the doctrine of sovereign immunity. (Docket No. 38 at 1.)

Additionally, Defendants move for summary judgment pursuant to FED. R. CIV. P. 56, arguing that Plaintiff does not offer sufficient evidence to support her claims for discrimination based on sexual harassment and retaliation. Id. Plaintiff opposed Defendants' motions. (Docket No. 45.) Defendants filed a reply and Plaintiff sur-replied. (Docket Nos. 51; 57.)

In her complaint, Plaintiff contends that she was sexually harassed by three different co-workers and subjected to continuous retaliation by senior management at Fort Buchanan. (See Docket No. 13.) Related to sexual harassment, Plaintiff alleges: (1) sexual harassment in 2008 by

Civil No. 13-1507 (GAG)

Manuel Sariego ("Sariego"), a co-worker from the Directorate of Human Resources ("DHR"); (2) sexual harassment in 2009 by Luis Comas ("Comas"), a supervisory human resources specialist at DHR, and (3) sexual harassment in August 2013 by a sexual harassment training instructor.  Id. As to her retaliation claims, Plaintiff alleges: (1) retaliation by her supervisor Maria Morales ("Morales") after filing an EEO complaint for Sariego's sexual harassment in 2009; (2) retaliatory transfer from the DHR to the Religious Support Office ("RSO") in the wake of her sexual harassment complaint against Comas in 2009; (3) non-selection for the Managerial Support Technician G6/G7 position at the DHR; and (4) a two-year delay in giving Plaintiff an annual appraisal due in 2011.  Id.

After reviewing the parties' submissions and pertinent law, the Court hereby **GRANTS in part and DENIES in part** Defendants' Motion to Dismiss at Docket Nos. 38, 40; and **DENIES** Defendants' Motion for Summary Judgment at Docket Nos. 38, 40.

## I.   Sham Affidavit

As a threshold matter, the Court addresses Defendants' contention that some of Plaintiff's factual allegations should be stricken because they contradict or are materially different than Plaintiff's previous statements during the administrative hearings.   (Docket No. 54 at 1-2.) Defendants contend Plaintiff is attempting to "create[] a genuine dispute of fact for purposes of summary judgment by disagreeing with herself."  Id. at 1 (citing Malave-Torres v. Cusido, 919 F. Supp. 2d 198, 203 (D.P.R. 2013); Rivera-Garcia v. Sprint PCS Caribe, 841 F. Supp. 2d 538, 546 (D.P.R. 2012)).  Defendants urge the Court to strike the following factual statements from the

Civil No. 13-1507 (GAG)

record: Docket No. 43 at 17-21 ¶¶ 8, 9, 14, 24, and 27.  These factual statements all originate from Plaintiff's deposition on December 8, 2014.  (See Docket No. 43-1.)[1]

Defendants essentially argue that Plaintiff's 2014 deposition is similar to a "sham affidavit" being introduced solely in an effort to create a material issue of fact.  (Docket No. 54 at 1-2.)  However, the Court disagrees that any of these statements contradict Plaintiff's prior testimony, and holds instead they serve to provide more details and further explain Plaintiff's statements from her administrative hearings.  Malave, 919 F. Supp. 2d at 203 (citing Nelson v. City of Davis, 571 F.3d 924, 928 (9th Cir. 2009)) ("[t]his doctrine excludes conflicting testimony given by an interested party, but does not bar a party from 'elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition.'").  Viewing the facts in the light most favorable to the non-moving party, in this case, the Plaintiff, the Court finds that the statements are properly supported by the record. Thus, the challenged statements shall not be stricken and are admissible as evidence.  At trial, Defendants are welcomed to use any statements they deem inconsistent as impeaching material.  See FED. R. EVID. 613.  However, at this stage, there are no grounds to exclude said statements.

## II.    Relevant Factual Background

The Court states the facts in the light most favorable to Plaintiff.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (consistent with the motion for summary judgment standard); see also Parker v. Hurley, 514 F.3d 87, 90 (1st Cir. 2008) (consistent with the motion to

---

[1] These statements contain Plaintiff's testimony that Sariego wanted to talk to her about her personal relationships, and whether she was single or divorced.  (See Docket No. 43 at 17 ¶ 8.)  Plaintiff also declared that she talked to Morales about Sariego's behavior, including his constant sexually charged comments towards Plaintiff.  Id. at 17-18 ¶¶ 9-14.  Plaintiff then testified that because Morales was not receptive to her complaints, she decided to create a separate folder for all of Sariego's non-work related e-mails.  Id. at 21 ¶¶ 24.  Plaintiff explained that while a separate folder would keep her from having to read Sariego's e-mails, she would nevertheless be disrupted by the e-mail notifications on her desktop.  Id. at 21 ¶ 27.

Civil No. 13-1507 (GAG)

dismiss standard).  Additionally, in accordance with Local Rule 56, the Court credits only facts properly supported by accurate record citations.[2]  See Local Rule 56(e).

Plaintiff is a civilian employee of the Army at Fort Buchanan ("Buchanan") Military Base in Puerto Rico who claims she has been subjected to sexual harassment by three different coworkers and subsequent retaliation by senior management over the course of 5 years.  (See Docket No. 13.)  At the time Plaintiff Osiris Soto filed this complaint, she was employed as a Management Support Technician at the DHR at Fort Buchanan.  (Docket Nos. 39 ¶ 1; 43 at 1 ¶ 1.) Plaintiff had been employed by the organization for approximately eleven years, and held the Management Support Technician position for the last two years under the supervision of Maria Morales, the Director of the DHR.  Id.  Plaintiff never received any warnings or negative performance reviews while working for the DHR.  (Docket Nos. 43 at 53 ¶ 225; 54 ¶ 225.)

Given the complicated history underlying Plaintiff's sexual harassment and retaliation claims, and the importance of the sequence of events to evaluating her claim, the Court has divided the account of the relevant facts into specific time periods based on her allegations.

**A.  Sexual Harassment Claim against Manuel Sariego**

Plaintiff's first alleged harasser was Manuel Sariego, the Casualty Assistant Officer at the DHR.  (See Docket No. 43 at 16-22.)  Like Plaintiff, Sariego's supervisor was also Maria Morales. (Docket Nos. 43 at 30 ¶ 75; 54 ¶ 75.)  Starting in 2008, Plaintiff described several instances in

---

[2] Local Rule 56 governs summary judgment practice before the U.S. District Court of Puerto Rico.  L.Cv.R. 56.  Local Rule 56 requires, in part, that "[u]nless a fact is admitted, the reply shall support each denial or qualification by a record citation as required by subsection (e) of this rule."  L.Cv.R. 56(d).  In addition, Local Rule 56 states: "[f]acts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted."  L.Cv.R. 56(e).  The First Circuit has made it pellucidly clear that a party, who ignores any provision of Local Rule 56, does so "at their peril."  Ruis Rivera v. Riley, 209 F.3d 24, 28 (1st Cir. 2000).  In this case, the Court deems the following statements admitted and uncontested due to Defendants' failure to provide any citation to the record: Docket No. 54 ¶¶ 14, 29, 32, 50, 66, 67, 80, 113, 138, 142, 148, 156, 179, 216, 218, 223-25, 227, 244, 281, 282, and 286.  (See Docket No. 54.)

Civil No. 13-1507 (GAG)

which Sariego allegedly harassed her by inviting her out to dinner, asking her to go to a hotel with him, and inquiring about her relationship status and what she liked about men.  (See Docket Nos. 43 at 17 ¶¶ 6-8; 54 ¶¶ 6-8.)  Plaintiff continually declined Sariego's advances.  (See Docket Nos. 43 at 17 ¶¶ 6-8; 54 ¶¶ 6-8.)

Plaintiff also claims Sariego created a hostile work environment by sending her inappropriate e-mails, visiting her constantly and often using phrases with inappropriate sexual connotation.  (Docket Nos. 43 at 18 ¶¶ 13-14; 54 ¶¶ 13-14.)  Plaintiff provided several e-mails in which Sariego referred to her as "nena,"[3] stated that the web portal was "orgasmic" and included explicit sexually suggestive pictures suggesting that in order to get promoted, a female had to give good "blow jobs."  (Docket Nos. 43 at 18-20 ¶¶ 15, 16, 22; 54 ¶¶ 15, 16, 22.)  Plaintiff alleges she told Morales about Sariego's e-mails and behavior, but Morales was "not receptive" to Plaintiff's complaints. (Docket No. 43 at 21 ¶ 24.)   Around August 2008, Plaintiff decided to create a separate folder in her e-mail where all non-work related e-mails from Sariego would be sent to.  Id. at 21 ¶¶ 24, 26.  Sariego sent Plaintiff a total of 448 e-mails.  (Docket Nos. 43 at 22 ¶ 29; 54 ¶ 29.) Master Sergeant Russell, a Non-Commissioned Officer in charge of DHR, and others also received inappropriate e-mails from Sariego.  (Docket Nos. 43 at 19 ¶¶ 17, 18; 54 ¶¶ 17, 18.)  Plaintiff complained to both Russell and Luis Comas, a Supervisory Human Resources Specialist at DHR, about these e-mails.  (Docket Nos. 43 at 19 ¶¶ 17, 18; 54 ¶¶ 17, 18.)

In November of 2008, Plaintiff claims Soto and Sariego were at Plaintiff's office when Morales entered, and Plaintiff informed Morales that she was unhappy with Sariego's visits, that he had called her a "gamberra"[4] and that she did not want to talk about non-work related things

---

[3] "Nena" means honey, dear, darling.  Nena, SPANISHDICT.COM, http://www.spanishdict.com/translate/nena.

[4] "Gamberra" means loose living, inmoral, libertine.  Gamberra, REVERSO DICTIONARY, www.dictionary.reverso.net (translating DICCIONARIO ENCICLOPÉDICO VOX 2009).

Civil No. 13-1507 (GAG)

with him.  (Docket No. 43 at 17 ¶ 9.)  It is uncontested that Morales told Soto that she was the one who had to deal with "several sexual gossips" and that it looked like Plaintiff and Sariego had a mishap marriage.[5]  (Docket Nos. 39 ¶ 4; 43 ¶ 9, 12; 54 ¶ 9, 11.)  Plaintiff contends this was the first time Morales learned of Sariego's sexual harassment of Plaintiff, and yet, failed to take appropriate action.  (Docket No. 43 at 18 ¶ 10.)  Morales instead claims to have understood Plaintiff's "complaint" as one that was work related, since Morales perceived Plaintiff and Sariego's relationship as one where they joked and teased each other often.  (Docket No. 39 ¶ 10.)

## B.  EEO Complaint #1 – Sexual Harassment by Manuel Sariego

On May 5, 2009, Plaintiff was blind copied on an e-mail from Sariego, which was especially alarming to her because in it Sariego stated that Comas had prior sexual relationships with two other female coworkers, and asked if Plaintiff had "fucked" Comas too.  (Docket Nos. 43 at 22 ¶ 32; 43 ¶ 32.)  After Plaintiff received this e-mail, she called Russell and translated it to him.  (Docket Nos. 43 at 23 ¶ 35; 54 ¶ 35.)  She informed Russell she would be heading to the EEO Office to report Sariego.  (Docket No. 43 at 23 ¶ 35; 54 ¶ 35.)  Plaintiff then went to Morales' office to tell her she was planning to file a complaint with the EEO, and Morales acknowledged that she had received Sariego's e-mail as well.  (Docket No. 43 at 23 ¶ 37; 54 ¶ 37.)  Plaintiff contends Morales then told Plaintiff she had to "stop being the way [she is] with that type of man," and that she had to be "more serious."  (Docket Nos. 43 at 24 ¶ 42; 54 ¶ 42.)  Later on both Morales and Russell admitted that there had been a previous incident with Sariego and another e-mail containing sexual content, for which the acting Director of Human Resources at that time tried to take disciplinary action, but failed to do so.  (Docket Nos. 43 at 34 ¶ 101; 54 ¶ 101.)

---

[5] Morales said in Spanish: "un matrimonio mal lleva'o."  (Docket Nos. 39 ¶ 4; 43 at 2 ¶ 4.)

Civil No. 13-1507 (GAG)

Defendants claim to have taken appropriate action after Plaintiff's complaint because immediately after Plaintiff informed Morales she had received Sariego's e-mail, Morales informed the Civilian Personnel Office and the Directorate of Information Management (DOIM) of Sariego's behavior and requested the e-mail to be added to a pending disciplinary action she had against Sariego related to the computer misuse claims. (Docket No. 39 ¶ 9.) Plaintiff claims the Army did not conduct a separate investigation to determine if Sariego had sexually harassed Plaintiff. (Docket No. 43 at 41 ¶ 148.) The Army policy on sexual harassment requires management to take immediate action to correct harassing behavior before it rises to the level of a hostile environment. (Docket Nos. 43 at 35 ¶ 110; 54 ¶ 110.) It is uncontested that within a period of six months, Sariego harassed three different women, including Plaintiff. (Docket Nos. 43 at 41 ¶ 152; 54 ¶ 152.)

In Plaintiff's EEO complaint, she also claimed that Morales knew about what had previously happened between Sariego and her, and had not taken corrective action, and thus should be held accountable as a Management Official. (Docket No. 43 at 25 ¶ 46-47; 54 ¶ 46-47.) After Plaintiff filed the EEO Complaint, she returned to Morales' office and handed her the complaint. (Docket Nos. 43 at 24 ¶ 43; 45 ¶ 45.)

### C. Retaliation by Maria Morales

Plaintiff contends Morales began to retaliate against her after learning that Plaintiff had also complained about her to the EEO. (Docket Nos. 43 at 24 ¶ 39; 54 ¶ 39.) Plaintiff claims from that point on, Morales stopped using her as an assistant, stopped sending her e-mails, making phone calls to her, assigning her work, and eventually decided to detail her to another section. (Docket No. 43 at 25 ¶¶ 48-49.) Plaintiff also asserts Comas told her that Morales no longer trusted her. Id. at 25 ¶ 49.

Civil No. 13-1507 (GAG)

Morales admits that she became more "guarded" after Plaintiff filed her complaint. (Docket No. 54 ¶ 49.)  However, Defendants posit that it was Plaintiff who stopped responding to Morales' work-related e-mails.  (Docket No. 54 ¶ 48.)  Because Plaintiff was heavily involved in the Lean Six Sigma project, which aimed to reduce cycle time for the ID cards section in the military personnel division, (Docket Nos. 43 at ¶ 54; 54 ¶ 54), Morales decided to take away some of Plaintiff's duties so she could focus on the Lean Six Sigma project.  (Docket No. 39 ¶ 43; 54 ¶ 43.)  Morales claims she was under significant pressure from the Command to make sure the Lean Six Sigma project was completed on time.  (Docket No. 39 ¶ 43; 54 ¶ 43.)  Nevertheless, Plaintiff asserts that even after July 31, 2009, when Plaintiff finished the Lean Six Sigma project, Morales still did not give Plaintiff her duties back.  (Docket No. 43 at 26-28 ¶¶ 52, 53, 56, 57, 60.)

Plaintiff claims Morales further retaliated by deciding to detail Plaintiff to the ID Card Section.  (Docket Nos. 43 at 41 ¶¶ 153, 154; 54 ¶ 153, 154.)  Plaintiff alleges Morales knew she had had issues with employees from that section before, due to Plaintiff's work on the Lean Sigma Six program, in which she was forced to make changes affecting those employees in the ID card section, and she had been met with opposition from those employees.  (Docket Nos. 43 at 42 ¶¶ 155, 160; 54 ¶ 155, 160.)  When Morales informed Plaintiff of her transfer to the ID card section, Morales acknowledged it was not a good move for Plaintiff's career.  (Docket Nos. 43 at 42 ¶ 157; 54 ¶ 157.)  The position within the ID Card section was the same one Plaintiff held in 1995 when she first started working for the Army.  (Docket Nos. 43 at 42 ¶ 159; 54 ¶ 159.)

**D.  EEO Complaint #2 – Sexual Harassment by Luis Comas**

Morales was Luis Comas' direct supervisor.  (Docket Nos. 43 at 30 ¶ 76; 54 ¶ 76.)  Comas interacted with Plaintiff on a daily basis.  (Docket Nos. 43 at 37 ¶ 121; 54 ¶ 121.)  Comas was also Sariego's first level supervisor.  (Docket Nos. 43 at 37 ¶ 122; 54 ¶ 122.)  After Sariego sent

Civil No. 13-1507 (GAG)

Plaintiff the May 5, 2009 e-mail, Comas' visits to Plaintiff's office increased.  (Docket Nos. 43 at 43 ¶ 165; 54 ¶ 165.)  On one occasion in Plaintiff's presence, Comas mentioned being shocked at the size of a female customer's breast.  (Docket Nos. 39 ¶ 44; 43 at 7 ¶ 44.)  He also had another discussion about active duty soldiers being sodomized in basic training.  (Docket Nos. 39 ¶ 44; 43 at 7 ¶ 44.)  Plaintiff alleges Comas' behavior was intimidating, specifically since Comas, being Sariego's supervisor, knew that Plaintiff had filed a sexual harassment complaint against Sariego.  (Docket Nos. 43 at 44 ¶ 168; 54 ¶ 168.)

On August 26, 2009, Plaintiff claims Comas entered Plaintiff's office and stood behind her looking down at her while she was sitting.  (Docket Nos. 43 at 43 ¶ 166; 54 ¶ 166.)  Plaintiff then proceeded to get up, as Comas told her in Spanish: "If what I tell you happens, you'll be mine for one night."  (Docket Nos. 43 at 44 ¶ 169; 54 ¶ 169.)  Comas then pushed her back down with his hand on Plaintiff's breast.  (Docket Nos. 43 at 44 ¶ 169; 54 ¶ 169.)  Comas then proceeded to leave, but as Plaintiff followed him out, he turned around and brushed his penis against her arm.  (Docket Nos. 43 at 44 ¶ 169; 54 ¶ 169.)  Comas then left her office.  (Docket Nos. 43 at 44 ¶ 169; 54 ¶ 169.)

After this incident, Plaintiff did not come back to the office because she was highly disturbed.  (Docket Nos. 43 at 44 ¶ 171; 54 ¶ 171.)  Plaintiff alleges that later on, Comas sent her a message through a co-worker advising her that he was not going to admit that he did anything wrong, and that he had hired two lawyers.  (Docket Nos. 43 at 45 ¶ 172; 54 ¶ 172.)  However, Comas denies ever touching Plaintiff.  (Docket No. 39 ¶ 51.)

Because of this incident, Plaintiff filed a second EEO Complaint alleging sexual harassment by Comas.  Defendants decided not to transfer Comas from his actual position upon receipt of the harassment complaint against him.  (Docket Nos. 43 at 52 ¶ 217; 54 ¶ 217.)  Instead,

Civil No. 13-1507 (GAG)

1   Plaintiff was transferred to the RSO as a Management Support Technician the day she came back

2   to work after the Comas incident.  (Docket Nos. 43 at 51 ¶¶ 210, 214; 54 ¶¶ 210, 214.)  Plaintiff

3   was told this would be a temporary transfer for 90 days, but she remained in that position for one

4   year.  (Docket Nos. 43 at 51 ¶¶ 210, 214; 54 ¶¶ 210, 214.)

5         In support of their motions, the parties have provided conflicting sworn declarations from

6   their respective attorneys as to the cause Plaintiff's transfer to the RSO.  Defendant's counsel, Mr.

7   Latimer, declared that Plaintiff's attorney contacted him directly and requested that Plaintiff be

8   transferred away from DHR after the Comas' incident.  It was then that Plaintiff was transferred to

9   the position in the RSO.  (Docket No. 39 ¶ 54; 39-5.)  Defendants also provided Plaintiff's

10   "Amendment to the Complaint" in the Administrative EEO Proceeding, in which Plaintiff

11   specifically requested to be "assigned to work in a harassment free atmosphere."  (Docket No. 51-3

12   at 6.)  Conversely, Plaintiff's attorney, Manuel Porro-Vizcara, contends that he never called

13   Attorney Latimer to request that Plaintiff be removed from her position.  (Docket No. 43-20 ¶ 12.)

14   Additionally, Plaintiff's counsel argued that if he had made this request he would have done so in

15   writing, in accordance with his customary practice.  Id. ¶ 9.  Attorney Latimer also contends

16   Plaintiff has corroborated his story several times when questioned.  Id. ¶ 13.

17      **E.  Retaliation Claims – Non-selection G6/G7 Position and Failure to Appraise in**

18          **2011**

19         Plaintiff contends that before filing her complaints, and because of her excellent

20   performance at work, Morales had initiated efforts to upgrade the GS classification of her position

21   to benefit Plaintiff, but was not successful.  (Docket Nos. 43 at 62 ¶ 275; 54 ¶ 275.)  Eventually,

22   Morales was able to create this new position after Plaintiff had already been transferred to the RSO

23   office.  (Docket Nos. 43 at 62 ¶ 276; 54 ¶ 276.)  When Plaintiff learned of the vacancy, she applied

24

Civil No. 13-1507 (GAG)

for the position.  (Docket Nos. 43 at 51 ¶ 213; 54 ¶ 213).  On September 9, 2010, Plaintiff learned the position had instead been given to Ricardo Villalba ("Villalba").    (Docket Nos. 43 at 51 ¶ 247; 54 ¶ 247.)  Villalba was previously a mail assistant in the Mail Distribution Center at Buchanan.  (Docket Nos. 43 at 54 ¶ 226; 54 ¶ 226.)  At the time Villalba was chosen for the position, he had been working at Fort Buchanan for approximately two years.  (Docket Nos. 43 at 57 ¶ 251; 54 ¶ 251.)  Plaintiff contends that Villalba had no prior experience with that position, and she was better qualified than Villalba considering she was the position's incumbent and had excellent performance evaluations.  (Docket No. 43 at 53 ¶ 225.)  Plaintiff alleges that she was not selected for this position in retaliation for her previous EEO activity.  (Docket Nos. 43 at 54 ¶ 227; 54 ¶ 227.)

In addition to not being selected for her previous upgraded position, Plaintiff contends Defendants also retaliated against her by failing to rate Plaintiff during her tenure at the RSO for the year 2011.  (Docket No. 13 ¶ 104.)  Plaintiff did not receive an evaluation until two years later in 2013.  (Docket Nos. 43 ¶ 286; 54 ¶ 286.)  Plaintiff claims that being non-rated diminished her chances of receiving promotions and salary increases in the future.  (Docket No. 13 ¶ 114.)

### F.  2013 Sexual Harassment Claim

Lastly, Plaintiff asserts that on August 26, 2013, she attended a sexual harassment training provided by the Sexual Assault Response coordinator in which she was touched inappropriately by the instructor.  Id. ¶¶ 115-116.  She claims the instructor made Plaintiff the subject of a "role play" sexual harassment exercise in which he made Plaintiff walk to the front of the room as a co-worker gave her "a leering up and down look like as if he wanted her."  Id. ¶ 115.  Plaintiff felt singled out as the only woman in the training, and informed the instructor that because she had previously suffered as a victim of sexual harassment in the office, she did not want to participate any longer.

**Civil No. 13-1507 (GAG)**

Id. ¶ 116.  The instructor then directed Plaintiff to sit down, and advised her to not worry since it was "just a training."  Id.

In sum, Plaintiff filed three EEO complaints from which her claims in this case arise.  First, on May 5, 2009, Plaintiff complained of sexual harassment by Sariego and subsequent retaliation by Morales.  Second, on September 14, 2009, Plaintiff complained of sexual harassment by Comas, and additional retaliatory action by Morales and the Army when she was involuntarily transferred out of her position.  Lastly, on November 2, 2010, Plaintiff filed her third EEO complaint, alleging that she was not selected for the Management Support Technician G6/G7 position in the DHR in retaliation for her previous EEO activity.

**III.     Motion to Dismiss**

**A.  Standard of Review**

Under Rule 12(b)(6), defendants may move to dismiss an action for failure to state a claim upon which relief can be granted.  See FED. R. CIV. P. 12(b)(6).  To survive a Rule 12(b)(6) motion, a complaint must contain sufficient factual matter "to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  The Court must decide whether the complaint alleges sufficient facts to "raise a right to relief above the speculative level."  Id. at 555.  In so doing, the Court accepts as true all well-pleaded facts and draws all reasonable inferences in the plaintiff's favor.  Parker, 514 F.3d at 90. However, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint alleged—but it has not show[n]—that the pleader is entitled to relief."  Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009) (quoting FED. R. CIV. P. 8(a)(2)) (internal quotation marks omitted).

Civil No. 13-1507 (GAG)

1    Defendants also argue that Plaintiff's failure to exhaust administrative remedies is a

2 jurisdictional issue.  (Docket No. 40 at 8.)  Under Rule 12(b)(1), defendants may move to dismiss

3 for lack of subject-matter jurisdiction.  See FED. R. CIV. P. 12(b)(1); see also Sumitomo Real

4 Estate Sales, Inc. v. Quantum Dev. Corp., 434 F. Supp. 2d 93, 95 (D.P.R. 2006) (citing Valentin v.

5 Hosp. Bella Vista, 254 F.3d 358, 362-63 (1st Cir. 2001)).  "In this type of jurisdictional challenge,

6 'the standard applied to a 12(b)(1) motion is similar to the standard applied to a 12(b)(6) motion,

7 namely, the court must take all of plaintiff's allegations as true and must view them, along with all

8 reasonable inferences therefrom, in the light most favorable to plaintiff.'"  Torres Maysonet v.

9 Drillex, S.E., 229 F. Supp. 2d 105, 107 (D.P.R. 2002) (quoting Freiburger v. Emery Air Charter,

10 Inc., 795 F.Supp. 253, 257 (N.D.Ill. 1992)).

11   **B.  Discussion**

12    **1.  Punitive Damages**

13    Plaintiff seeks punitive damages against the Army pursuant to 42 U.S.C. §1981a.  (Docket

14 No. 13.)  However, 42 U.S.C. §1981a expressly excludes the federal government from a claim of

15 punitive damages.  See 42 U.S.C. §1981a(b)(1).  Plaintiff concedes any claim for punitive damages

16 is barred because Congress has not waived sovereign immunity to permit recovery of such

17 damages against an agency of the federal government.  (See Docket No. 45 at 2.)  Thus,

18 Defendants' Motion to Dismiss Plaintiff's claim for punitive damages is hereby **GRANTED**.

19    **2.  Failure to Exhaust Administrative Remedies**

20    Defendants urge the Court to dismiss Plaintiff's claims for (1) retaliatory assignment to the

21 RSO, (2) failure to provide an annual appraisal in 2011, and (3) sexual harassment during a 2013

22 training, based on Plaintiff's failure to exhaust administrative remedies.  (Docket No. 40 at 6.)

23 She claims to have complied with all conditions precedent to the filing of this complaint by filing

24

Civil No. 13-1507 (GAG)

three administrative charges before the Agency's EEO Office and the EEOC, including sexual harassment, discrimination, hostile work environment and retaliation.    (Docket No. 13 ¶ 8.) Plaintiff further alleges that on September 4, 2012, the EEOC issued an Order of Voluntary Dismissal in which it directed the Agency to issue a Final Agency Decision.  Id.  Finally, Plaintiff alleges on March 28, 2013, the Agency issued its Final Decision, and Plaintiff filed within 90 days of receiving such decision.  Id. ¶ 9.

Generally, federal employees pursuing discrimination claims in federal court must first exhaust all available administrative remedies.  Brown v. General Services Administration, 425 U.S. 820, 832 (1976); Franceschi v. U.S. Dep't. of Veterans Affairs, 514 F.3d 81, 85 (1st Cir. 2008). "The Title VII administrative process begins with the filing of an administrative charge before the EEOC." Franceschi, 514 F.3d at 85 (citations omitted).  The Code of Federal Regulations ("CFR") provides the procedures a complainant must follow administratively before filing an action in district court.[6]  See 29 C.F.R. §§ 1614.103, 1614.105.

The First Circuit has recognized an exception to the exhaustion of administrative remedies requirement for discrimination claims.  See Clockedile v. New Hampshire Dept. of Corrections, 245 F.3d 1, 6 (1st Cir. 2001).  Retaliation claims can be brought before a district court without being explicitly alleged before the EEOC "so long as the retaliation is reasonably related to and grows out of the discrimination complained of to the agency-e.g., the retaliation is for filing the agency complaint itself." Id.  A retaliation claim is "reasonably related" when it shares the same

---

[6] The plaintiff must make the initial contact with an EEO officer within 45 days of the complained conduct and then may file a formal complaint with the EEO if the issue is not resolved.  See 29 C.F.R. §§ 1614.105, 1614.106. The formal complaint must be filed with the agency within 15 days of receiving notice from the EEO counselor.  See 29 C.F.R. § 1614.105. If the agency issues a final agency decision ("FAD"), then the plaintiff has 90 days to appeal. See 29 C.F.R. § 1614.407. If after 180 days the agency has not issued a FAD, the plaintiff may file an action with the district court or appeal to the EEOC to have the complaint decided by an administrative law judge.  See id.; 29 C.F.R. § 1614.110(a). Federal employees, such as Plaintiff in this case, must exhaust these administrative remedies prior to filing an action with the district court.  See Velazquez-Ortiz, 657 F.3d at 71.

Civil No. 13-1507 (GAG)

factual allegations as the original discrimination claim.  See Garayalde-Rijos v. Municipality of Carolina, 747 F.3d 15, 22 (1st Cir. 2014); see also B.K.B. v. Maui Police Dept., 276 F.3d 1091, 1100 (9th Cir. 2002) (for purposes of determining whether a claim is reasonably related courts look to such factors as the alleged basis of discrimination, dates of discriminatory acts alleged, perpetrators named in the EEOC charges, and the location at which the discrimination is alleged to have occurred).  That a retaliation claim may lie even though a plaintiff failed to exhaust the administrative requirement indicates "the First Circuit's concern with retaliatory conduct . . . which arises after, if not as a result of, an employee's invocation of the EEOC process."  Munoz Rivera v. Walgreens Co., 428 F. Supp. 2d 11, 22 (D.P.R. 2006) (quoting Kenney v. MML Investors Servs., 266 F. Supp. 2d 239, 245-46 (D. Mass. 2003)) (internal quotation marks omitted).

In this case, Defendants argue that because Plaintiff's failure to initiate the complaint process with the EEO office on her claim that she was transferred to the RSO, she did not exhaust administrative remedies and her claim is barred.  (Docket No. 40 at 7.)  The Court disagrees. Plaintiff's claim that she was transferred to the RSO falls squarely within Clockedile's exception as a "discrete act[ ] of retaliation" stemming from a plaintiff's EEO activity.  See Clockedile, 245 F.3d at 6.

Plaintiff filed her first EEO complaint on May 9, 2009.  (Docket No. 13 ¶ 45.)  Plaintiff has presented evidence that immediately following this complaint, Morales began retaliating against her by reducing her duties, detailing her to another section, and giving her the "silent treatment." Id. ¶ 58-60.  Plaintiff then filed a second EEO complaint, on September 14, 2009, alleging sexual harassment, naming Comas as the harasser and again identifying Morales as a responsible supervisor who failed to take action.  Id. ¶ 89.  Immediately thereafter, Plaintiff claims that in response to her EEO complaint, the Army transferred her to the RSO office instead of transferring

Civil No. 13-1507 (GAG)

Comas, her alleged harasser.  Id. ¶ 90, 91. Thus, like in Clockedile, the pattern of alleged retaliation began almost immediately after Plaintiff filed her initial EEO complaint, and continued after her second EEO complaint, culminating with Plaintiff's transfer to the RSO.  Clockedile, 245 F.3d at 2-3.  Because Plaintiff's alleged retaliation claim is "reasonably related" and "grow[s] out" of her sexual harassment complaints, the administrative process for such claim was properly exhausted.  See id. at 6.

However, Plaintiff did fail to exhaust administrative remedies as to the two other claims. Though Plaintiff claims to have effectively exhausted administrative remedies in relation to her 2011 appraisal claim by raising the issue before the EEOC, and amending the pending EEO complain to add a "like or related" claim, she has not satisfied her burden to allege enough facts to show she has exhausted administrative remedies.[7]  See Gregory v. YWCA Haverhill, Inc., CIV. 13-11342-FDS, 2014 WL 3798893, at *2 (D. Mass. Jul. 30, 2014).  While Plaintiff contends that the EEOC decided that Plaintiff did not need to present her claim before the EEO office, she provides no evidence to substantiate this claim.  (Docket No. 45 at 29.)

Plaintiff also argues the Army's failure to provide her with an annual appraisal in 2011 was a retaliatory action, and thus, under Clockedile her claim is not barred for failure to exhaust the administrative process.  However, the Clockedile exception is a narrow one, and claims are not "reasonably related" unless they share factual allegations.  See Franceschi, 514 F.3d at 86; see also Garayalde, 747 F.3d at 22.  Plaintiff does not allege any facts that link the Army's failure to provide her with an appraisal in 2011 to any of the actors that she mentioned in her EEO

---

[7] Plaintiff raised this issue at the EEOC, seeking to amend the Complaint pursuant to 29 C.F.R. § 1614.106(d), to assert the Army failed to complete her 2011 annual rating in retaliation for filing the 2010 EEO complaint.  (Docket No. 51-1 at 2-5.)  The Army objected, stating that the new allegation was not previously included as part of the claim, and had not been investigated during the administrative fact finding conference.  (Docket No. 51-2 at 1.)  Additionally, the Army argued the amendment should be denied because the failure to appraise in 2011 was a different discrete act, separate and apart from the previous acts complained about.  Id.

16

Civil No. 13-1507 (GAG)

complaint.  Furthermore, Plaintiff did not plead any facts to show that her previous sexual harassment or retaliation complaint is connected to the Army's failure to appraise her.  The timing also does not support an inference of retaliation because Plaintiff filed the EEO Complaint in November, 2010, and the annual rating at issue was not overdue until March 31, 2011.  Because the Court does not find this claim is "reasonably related to" or that it "grew out of" Plaintiff's EEO complaint, she has not properly exhausted her administrative remedies as to this claim.

Plaintiff's claim for sexual harassment during the 2013 training is also barred for failure to exhaust administrative remedies.  By its own terms, the <u>Clockedile</u> exception does not extend to additional discrimination claims.  <u>See</u> <u>Clockedile</u>, 245 F.3d at 6 (taking "no position on the proper rule for non-retaliation claims."); <u>see</u> <u>also</u> <u>Calderon v. UNITEX, INC.</u>, 885 F. Supp. 2d 539, 543 (D.P.R. 2012) ("the First Circuit rationale was that the exception is to be interpreted in a narrower manner, and should only be limited to retaliation claims.").  While certainly exhausting her administrative remedies with regards to retaliatory assignment to the RSO, the <u>Clockedile</u> exception does not extend to additional non-retaliation claims such as a different sexual harassment incident.

Thus, the Court **GRANTS** Defendants' Motion to Dismiss the 2013 sexual harassment and 2011 failure to appraise claims, hereby dismissing both claims for failure to exhaust administrative remedies. However, because Plaintiff's alleged involuntary retaliatory transfer to the RSO is "reasonably related to and grows out of" her sexual harassment complaints, this Court **DENIES** Defendant's Motion to Dismiss as to that claim.  <u>See</u> <u>Clockedile</u>, 245 F.3d at 6.

The Court now directs its analysis to Defendants' Motion for Summary Judgment at Docket Nos. 38, 40.

Civil No. 13-1507 (GAG)

### IV.   Motion for Summary Judgment

#### A.  Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see FED. R. CIV. P. 56(a). "An issue is genuine if 'it may reasonably be resolved in favor of either party' at trial, . . . and material if it 'possess[es] the capacity to sway the outcome of the litigation under the applicable law.'" Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006) (alteration in original) (internal citations omitted). The moving party bears the initial burden of demonstrating the lack of evidence to support the non-moving party's case. Celotex, 477 U.S. at 325. "The burden then shifts to the nonmovant to establish the existence of at least one fact issue which is both genuine and material." Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994). The nonmovant may establish a fact is genuinely in dispute by citing particular evidence in the record or showing that either the materials cited by the movant "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R.CIV. P. 56(c)(1)(B). If the Court finds that some genuine factual issue remains, the resolution of which could affect the outcome of the case, then the Court must deny summary judgment. See Anderson, 477 U.S. at 248.

When considering a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party and give that party the benefit of any and all reasonable inferences. Id. at 255. Moreover, at the summary judgment stage, the Court does not make credibility determinations or weigh the evidence. Id. Summary judgment may be

**Civil No. 13-1507 (GAG)**

appropriate, however, if the nonmoving party's case rests merely upon "conclusory allegations, improbable inferences, and unsupported speculation." Forestier Fradera v. Mun. of Mayaguez, 440 F.3d 17, 21 (1st Cir. 2006) (quoting Benoit v. Technical Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003)).

### B. Discussion

Defendants seek summary judgment of Plaintiff's sexual harassment claim because she does not have sufficient evidence to show that any harassment was severe or pervasive, or in the alternative, because Plaintiff lacks the ability to impute liability to Defendants for the conduct of Sariego and Comas. (Docket No. 40 at 2.) Defendants also argue that Plaintiff's retaliation claim fails because she lacks evidence of retaliatory motive and has not identified an adverse employment action that is actionable under Title VII's retaliation standard. Id. The Court will discuss each argument in turn.

### 1. Title VII

#### a. Sexual Harassment

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Sexual harassment constitutes sex discrimination prohibited by Title VII. Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986); see also Gorski v. N.H. Dep't of Corrections, 290 F.3d 466, 472 (1st Cir. 2002). There are two types of actionable sexual harassment claims under Title VII: hostile work environment claims and quid pro quo harassment claims. See Valentin-Almeyda v. Municipality of Aguadilla, 447 F.3d 85, 94 (1st Cir. 2006). Plaintiff's claim is based on a hostile work environment theory.

Civil No. 13-1507 (GAG)

A plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment.  See Forrest v. Brinker Intern. Payroll Co., LP, 511 F.3d 225, 228 (1st Cir. 2007) (internal citations and quotations omitted); Meritor, 477 U.S. at 66 ("Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult.").   In order to state a prima facie case of hostile work environment under Title VII a plaintiff must show the following:

> (1) that she (or he) is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

Forrest, 511 F.3d at 228 (quoting Crowley v. L.L. Bean, Inc., 303 F.3d 387, 395 (1st Cir. 2002)). Defendants contend that Plaintiff fails to establish the fourth and sixth elements of the prima facie case: that the conduct was sufficiently severe or pervasive, and that Defendants can be held liable as the employer.

### i.  Severe or Pervasive

A Title VII hostile work environment claim exists where a "workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  Harris v. Forklift Sys., 510 U.S. 17, 21 (1993) (quoting Meritor, 477 U.S. at 65).  The First Circuit has explained that finding a hostile work environment "does not depend on any particular kind of conduct" and "that [t]here is no precise formula for establishing sufficiently egregious conditions." Perez-Cordero v. Wal-Mart Puerto Rico, Inc., 656 F.3d 19, 29 (1st Cir. 2011).  Courts must look at the "totality of the circumstances, including 'the frequency of the discriminatory conduct; its

Civil No. 13-1507 (GAG)

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Valentin-Almeyda, 447 F.3d at 94.

Courts have distinguished between commonplace indignities and actionable harassment in the workplace. Offhand remarks, simple teasing, tepid jokes, and isolated incidents are at one end of the continuum and are not actionable. Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). This type of behavior, standing alone, usually does not amount to a hostile work environment. Id. Severe or pervasive sexual remarks, bothersome attentions, innuendoes, ridicule, and intimidation are at the other end of the continuum and may establish a hostile work environment. Noviello v. City of Boston, 398 F.3d 76, 92 (1st Cir. 2005); Marrero v. Goya of Puerto Rico, Inc., 304 F.3d 7, 19 (1st Cir. 2002). Determining where on the continuum specific conduct lies is a difficult task typically best left to a jury. See Marrero, 304 F.3d at 18 (quoting Gorski, 290 F.3d at 474 ("'[s]ubject to some policing at the outer bounds,' it is for the jury to weigh those factors and decide whether the harassment was of a kind or to a degree that a reasonable person would have felt that it affected the conditions of her employment.").

Mindful that the "totality of the circumstances" must be taken into consideration when analyzing the existence of a hostile work environment, the Court will evaluate Plaintiff's two sexual harassment claims jointly. See Valentin-Almeyda, 447 F.3d at 94.

Plaintiff's first EEO complaint filed on May 5, 2009 dealt with Sariego's sexual harassment. Plaintiff presented evidence that Sariego continually made sexual comments, sent inappropriate e-mails, and asked her out multiple times after she refused. (See Docket Nos. 43 at 17 ¶¶ 6-8; 54 ¶¶ 6-8.) Sariego specifically asked Plaintiff out to dinner, to meet at a hotel, and inquired about "the things she liked in men." (See Docket Nos. 43 at 17 ¶¶ 6-8; 54 ¶¶ 6-8.) He

Civil No. 13-1507 (GAG)

would constantly call her names such as "gamberra," "nena" and used inappropriate language like "orgasmic." (Docket Nos. 43 at 18-20 ¶¶ 15, 16, 22; 54 ¶¶ 15, 16, 22.) Furthermore, Plaintiff presented evidence that Sariego sent a total of 448 e-mails to her in the span of two or three months, which included sexually suggestive pictures suggesting that in order to get promoted, a female had to "give good blow jobs." (Docket Nos. 43 at 22 ¶ 29; 54 ¶ 29.) The massive amount of inappropriate e-mails from Sariego culminated with a final e-mail in which he asked if Plaintiff had "fucked" Comas. (Docket Nos. 43 at 22 ¶ 32; 43 ¶ 32.) Plaintiff presented evidence of multiple incidents of sexual harassment, occurring over several months that bothered Plaintiff enough that she created a separate folder for Sariego's e-mails. (Docket No. 43 at 21 ¶ 24-26.) At this stage, the Court finds that Plaintiff provided sufficient evidence to support a finding that such conduct is sufficiently severe or pervasive to survive a motion for summary judgment.

Additionally, Comas' alleged sexual harassment, for which Plaintiff filed her second EEO Complaint on September 9, 2009, is also sufficiently severe and pervasive. A "single act of harassment may, if egregious enough, suffice to evince a hostile work environment." Gerald, 707 F.3d at 18; (citing Noviello, 398 F.3d at 84 (citations omitted)). The allegations that Comas purportedly pushed Plaintiff's breast and brushed his penis against her arm clearly qualifies as egregious. Additionally, Plaintiff has further alleged other unwelcome and sexually harassing conduct by Comas, such as lewd comments about a costumer's large breasts and about active duty soldiers being sodomized in basic training. (Docket Nos. 39 ¶ 44; 43 at 7 ¶ 44.) Such conduct was especially intimidating to Plaintiff because Comas knew that she had filed a sexual harassment claim against Sariego, who worked under Comas' supervision. (Docket Nos. 43 at 44 ¶ 168; 54 ¶ 168.) There is enough evidence to show that Comas' behavior certainly was severe enough to affect the conditions of Plaintiff's employment, because Plaintiff left that day, and did not come

**Civil No. 13-1507 (GAG)**

back to the office until two weeks later, on September 14, 2009.  (Docket Nos. 43 at 44 ¶ 171; 54 ¶ 171.)

Viewing the evidence in the light most favorable to Plaintiff and resolving all factual disputes in her favor, the record provides several sexually charged incidents, including one unwanted sexual physical contact with an intimate body part. Consequently, the Court declines to find that this behavior is insufficient to support a claim because a reasonable jury could find it severe and pervasive.

### ii.  Employer Liability

Defendants argue that they are not liable under Title VII because it is (1) impossible to conclude that the Army knew or should have known that Sariego subjected Plaintiff to a hostile work environment; and (2) there was no negligence by the Army's handling of Comas' alleged sexual harassment.  The sixth prong of a hostile work environment test requires a plaintiff to demonstrate some basis for employer liability.  See Crowley, 303 F.3d at 395.  Different rules apply depending on whether the harassing employee is a supervisor or a co-worker.  Id. at 401. Because there is no dispute that Sariego and Comas were Plaintiff's co-workers, Plaintiff must prove that Defendants "knew or should have reasonably known" of the alleged sexual harassment and failed to take prompt action for her claim to lie.  Id.

An employer is vicariously liable when a supervisor creates a hostile work environment, absent an affirmative defense.  Noviello, 398 F.3d at 94 (citing Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998); Faragher v. City of Boca Raton, 524 U.S. 775, 807-08 (1998)).  This defense, familiarly known as the Ellerth/Faragher defense, is not available when "the supervisor's harassment culminates in tangible employment action, such as discharge, demotion, or undesirable reassignment." Faragher, 524 U.S. at 808.

Civil No. 13-1507 (GAG)

    In this case, Plaintiff argues that "there is no controversy" that Comas was Plaintiff's supervisor, but presents no evidence to substantiate this claim.  (Docket No. 57 at 7.)  In order for vicarious liability to apply, Comas must have been Plaintiff's supervisor at the time he allegedly harassed her.  See Vance v. Ball State U., 133 S. Ct. 2434, 2439 (2013) ("an employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim.").  There is no evidence before the Court that Comas possessed the authority to "hire, fire or demote Plaintiff."  See id.  Thus, the Court will apply the negligence standard.

    To establish employer liability for the conduct of a co-worker, a plaintiff must demonstrate the employer was negligent; essentially, that the defendant "knew or should have known" of the alleged harassing conduct and failed to respond with prompt and appropriate action.  Crowley, 303 F.3d at 401.  Knowledge may be imputed to an employer if information regarding the harassment reaches an individual who is designated to receive such complaints and has the power to remedy the problem, or "who is reasonably believed to have a duty to pass on the information."  Id. at 403 (citing Sims v. Health Midwest Physician Servs. Corp., 196 F.3d 915, 920 (8th Cir. 1999)).  When a plaintiff bases a hostile work environment claim on the actions of co-workers, she retains the burden of proof to show the employer's knowledge and the inadequacy of its response.  Ortiz v. Hyatt Regency Cerromar Beach Hotel, Inc., 422 F. Supp. 2d 336, 342 (D.P.R. 2006).   The employer's response "must be reasonably calculated to prevent further harassment under the particular facts and circumstances of the case at the time the allegations are made."  Otero Vazquez v. Am. Home Prods. Corp., No. Civ. 01-2126(RLA), 2005 WL 2001299, at *10 (D.P.R. Aug. 19, 2005).  "Determining what constitutes a 'prompt and appropriate' employer response to allegations

Civil No. 13-1507 (GAG)

of sexual harassment often requires the sort of case-specific, fact-intensive analysis best left to a jury." Forrest, 511 F.3d at 232.

In the present case, Plaintiff has presented enough evidence to raise a trial issue regarding whether high-up management at Buchanan was aware of Sariego's e-mails and the adequacy of their response to Plaintiff's complaint.  There are also triable issues of material fact as to when Morales first learned of Sariego's harassing conduct.  Plaintiff has presented evidence that it was in 2008, when Morales came to Plaintiff's office and found Sariego in there, and Plaintiff asserted that Sariego called her "gamberra" and that she did not like to talk about non-work related matters with Sariego.  (Docket No. 43 at 17 ¶ 9.)  Plaintiff asserts that Morales did not take immediate action, and instead told her that Plaintiff had "several sexual bochinches" to deal with herself, and that it looked like Sariego and Plaintiff had a "mishap marriage."  (Docket Nos. 39 ¶ 4; 43 ¶ 9, 12; 54 ¶ 9, 11.) Additionally, Plaintiff presented evidence that Morales had to know of Sariego's inappropriate e-mails, since Morales herself had also received multiple inappropriate e-mails from Sariego prior to this date.  (Docket No. 43 at 24 ¶ 44.)

Morales on the other hand, claims that she could have not reasonably understood Plaintiff to have complained about sexual harassment then, since she perceived Plaintiff and Sariego's relationship as one where they joked and teased each other often.  (Docket No. 39 ¶ 10.)  Morales instead claims that she only learned about Plaintiff's allegations of sexual harassment by Sariego after the May 5th e-mail, for which Plaintiff filed the first EEO complaint.  (Docket No. 39 ¶ 7.) Morales asserts that as soon as Plaintiff told her about the e-mail, and Morales acknowledged she had also received it, Morales informed the Civilian Personnel Office and the Directorate of Information Management and added Plaintiff's complaint to Sariego's already pending investigation for other incidents of computer misuse.  (Docket No. 39 ¶ 9.)

Civil No. 13-1507 (GAG)

Plaintiff's uncontested testimony establishes that she informed the following supervisory and management-level individuals of alleged sexual harassment incidents: Comas, Morales, and Russell, all of whom had already received multiple inappropriate e-mails from Sariego in the past. (Docket Nos. 43 at 19, 30 ¶¶ 17, 18, 75; 54 ¶¶ 17, 18, 75.)  All three had the power to remedy the situation and a duty to pass on information regarding Plaintiff's sexual harassment complaints. The Court also notes Plaintiff's assertion that she told Morales she was going to file a complaint with the EEO against Sariego, and Morales told Plaintiff to "stop being the way [she is] with that type of man," and that she had to be "more serious."  (Docket Nos. 43 at 24 ¶ 42; 54 ¶ 42.)

Defendants argue that they were not negligent because Morales and other officials were already taking disciplinary action against Sariego, which ultimately lead to his termination. (Docket No. 51 at 12.)  However, a reasonable jury could find that even though an investigation already ensued against Sariego, Defendants' failed to take prompt action given the amount of complaints and issues they had had with Sariego's computer misuse in the past.  A reasonable jury could also find the Army had multiple prior complaints about Sariego, and information that would have left any reasonable employer to believe that he would continue to act inappropriately towards other employees, especially women.

As to Comas' sexual harassment, it is undisputed that Comas made inappropriate comments and had inappropriate physical contact with Plaintiff.  Plaintiff alleges Defendants were negligent in handling her complaint, because she involuntarily transferred her to another department, while Comas, the alleged harasser, remained in his previous position. (Docket Nos. 43 at 52 ¶ 217; 54 ¶ 217.)  Defendants argue that she never reported Comas' alleged physical contact to any management official, or informed Comas or any management official that she felt uncomfortable or harassed.  (Docket No. 40 at 24.)  Plaintiff contends that the Army's failure to in

Civil No. 13-1507 (GAG)

handle of all of her complaints perpetuated the harassment at the office and exposed her to further sexual harassment by others, such as Comas.  (Docket No. 45 at 32.)  Defendants maintain that they investigated Plaintiff's complaint, and interviewed eight employees.  (Docket No. 39 ¶ 55.)  Plaintiff declined to be interviewed or to participate in the investigative process, leaving the Army without any evidence to substantiate her claim that she had been harassed by Comas.  Id.  Plaintiff claims that she cooperated with the investigation through her attorney.  (Docket No. 43 ¶ 55.)  This is a disputed material fact that precludes summary judgment.

Both parties have provided conflicting sworn testimony from counsel for each side as to the cause of this transfer, and thus, triable issues of material fact remain as to how the Army dealt with Plaintiff's sexual harassment allegations.  Because genuine issues of material fact regarding employer liability for severe and pervasive sexual behavior remain, summary judgment as to Plaintiff's sexual harassment claim is **DENIED**.

### b.  Retaliation

Plaintiff also alleges Defendants retaliated against her for filing EEO complaints alleging sexual harassment.  (Docket No. 13 at 26-28.)

Title VII makes it unlawful for an employer to retaliate against a person who complains about discriminatory employment practices "or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing'."  Burlington Northern & Santa Fe Ry. v. White, 548 U.S. 53, 60 (2006) (citing 42 § 2000e-3(a)).  "The relevant question is whether [the employer] was retaliating against [the plaintiff] for filing a complaint, not whether he was motivated by gender bias at the time."  See DeCaire v. Mukasey, 530 F.3d 1, 19 (1st Cir. 2008).

Civil No. 13-1507 (GAG)

To state a prima facie case of Title VII retaliation, Plaintiff must establish that: (1) she engaged in protected conduct under Title VII; (2) she suffered a materially adverse employment action that harmed the plaintiff inside or outside the workplace and that was harmful enough to 'dissuade a reasonable worker from making or supporting a charge of discrimination,'; and (3) that the adverse action taken against her was causally connected to his or her protected activity. <u>Fantini v. Salem State College</u>, 557 F.3d 22, 32 (1st Cir. 2009); <u>Bibiloni Del Valle v. Puerto Rico</u>, 661 F. Supp. 2d 155, 168 (D.P.R. 2009) (quoting <u>Mariani-Colon v. Dep't of Homeland Sec. ex rel. Chertoff</u>, 511 F.3d 216, 223 (1st Cir. 2007)).  The First Circuit has repeatedly acknowledged that the plaintiff's prima facie burden is not onerous and is easily satisfied.  <u>See, e.g.</u>, <u>Calero-Cerezo v. U.S. Dep't of Justice</u>, 355 F.3d 6, 26 (1st Cir. 2004); <u>Chungchi Che v. MBTA</u>, 342 F.3d 31, 38 (1st Cir. 2003); <u>Fennell v. First Step Designs</u>, 83 F.3d 526, 536 (1st Cir. 1996).

Once the plaintiff satisfies her prima facie burden, the defendant must produce a legitimate, nondiscriminatory reason for the adverse action.  <u>Wright v. CompUSA, Inc.</u>, 352 F.3d 472, 478 (1st Cir. 2003) (citations omitted).  It ultimately falls on the plaintiff to show that the employer's articulated reason was pretext to cover up retaliation.  <u>Id.</u> at 478.

### i.  Prima Facie Case - Adverse Employment Action

Defendants maintain that Plaintiff never suffered "adverse employment actions" as a result of her EEO complaints, and thus, Plaintiff fails to make a prima facie case of retaliation.  (Docket No. 40 at 13-17.)[8]

Whether a particular action is "materially adverse" requires a case-by-case inquiry and "should be judged from the perspective of a reasonable person in the plaintiff's position,

---

[8] Defendants do not dispute that Plaintiff engaged in conduct protected by Title VII when she filed charges with the EEO in 2009 and 2010.  <u>See</u> <u>Mariani-Colón</u>, 511 F.3d at 223.  Defendants also do not dispute that if the Court were to find the employment actions adverse, those actions would be casually connected to her protected activity.  <u>See</u> <u>Univ. of Texas Southwestern Medical Center v. Nassar</u>, 133 S.Ct. 2517, 2533 (2014).

28

Civil No. 13-1507 (GAG)

considering all the circumstances." Id. at 71 (citation and internal quotation marks omitted); see also Billings v. Town of Grafton, 515 F.3d 39, 54 n.13 (1st Cir. 2008) ("retaliatory actions that are not materially adverse when considered individually may collectively amount to a retaliatory hostile work environment.").

To defeat summary judgment, a plaintiff must make a colorable showing that the actions taken against her rise to the level of a "materially adverse" action such that it "well might have dissuaded a reasonable [person] from making or supporting a charge of discrimination." Burlington N., 548 U.S. at 57.  The plaintiff cannot simply make a trivial grievance; it must be material, something "that produces an injury or harm." Id. at 67.

"Examples of adverse employment actions in the retaliation context include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation."  Morales-Vallellanes v. Potter, 605 F.3d 27, 36 (1st Cir. 2010) (internal quotations omitted).  "Minor disruptions in the workplace, including 'petty slights, minor annoyances, and simple lack of good manners,' fail to qualify." Id. (quoting Burlington N., 548 U.S. at 68).

The Court deduces from Plaintiff's statement of facts, parties' submissions and attachments thereto, four different adverse actions that Plaintiff claims are connected to her protected activity: (1) she received "silent treatment" and had her work duties removed by Morales following the 2009 EEO Complaint; (2) she was transferred to the ID Card Section in retaliation for her sexual harassment complaint against Sariego; (3) she was transferred to the RSO in retaliation of her sexual harassment complaint against Comas, and; (4) she was not chosen for the G6/G7 position as a Management Support Technician.  (See Docket No. 57 at 4.)

Civil No. 13-1507 (GAG)

### 1.   Silent Treatment and Removal of Duties

Plaintiff first alleges Morales retaliated against her by giving her the "silent treatment" because she stopped communicating with Plaintiff, sending her e-mails, calling her and assigning her work.  (Docket No. 45 at 19.)  The Court notes that other district courts have found that a plaintiff who is ignored or subjected to silent treatment after reporting discrimination has not suffered a materially adverse employment action.  See Thirkield v. Neary & Hunter OB/GYN, LLC, 76 F. Supp. 3d 339, 350-51 (D. Mass. 2015).   However, "a change in employee's responsibilities may be sufficient to establish an adverse employment action," if under the totality of the circumstances, the Court finds there has been a significant change in an employee's work assignments.  Colon-Fontanez v. Mun. of San Juan, 660 F.3d 17, 42 (1st. Cir. 2011) (citing Blackie v. State of Me., 75 F.3d 716, 725 (1st Cir. 1996)).   A "significant change" that is materially adverse can occur even when employee's salary or benefits were not reduced.   Simas v. First Citizens' Fed. Credit Union, 170 F.3d 37, 50 (1st Cir. 1999).

In this case, Plaintiff maintains that immediately after filing her complaint, Morales stopped communicating with her, would not "use her" as her secretary, would not call her, and would contact other people to communicate with Plaintiff.   (Docket No. 43 at 27 ¶ 56-57.) Plaintiff presented evidence that she had three main duties taken away from her: (1) the Defense Travel System (DTS), (2) Performance Management Reviews (PMR) and (3) Installation Status Report (ISR).  Id. ¶ 58.

Before filling her sexual harassment claim, Plaintiff was appointed DTS for the DHR, and assisted the directorates in generating travel vouchers, receiving reimbursements, and preparing reservations.   Id. ¶ 61.  Plaintiff's duties also included the creation of ISRs, which assessed different divisions' spending patterns on a quarterly basis.  Id. at 28 ¶ 63.  Plaintiff also worked on

Civil No. 13-1507 (GAG)

PMRs on a quarterly basis, creating power points based on data collection from all the directorates to aid the preparation of action plans.  Id. ¶ 64.   Additionally, Plaintiff scheduled Morales' appointments, and acted as her secretary, even considering herself Morales' right hand.  Id. ¶ 65-66.  Plaintiff testified that Morales considered Plaintiff her most trusted employee and Plaintiff "would do practically everything for her."  Id. at 29 ¶ 66.  Plaintiff maintains that these duties were taken away from her when she filed her complaint and she was left only with the Lean Six Sigma project.  Id. at 27 ¶ 56.  Morales maintains that none of these actions were retaliatory, and she simply removed those duties so that Plaintiff could focus on Lean Six Sigma.  (Docket No. 54 ¶ 65.)  Defendants claim the Lean Six Sigma project was a very important project for the installation command, and it was a high profile responsibility for Plaintiff to handle.  Id. ¶ 66.

Plaintiff was stripped of many of her responsibilities.  Even if her duties were reduced to free her time for the Lean Six Sigma project, a reasonable jury could find that a "significant change" occurred in Plaintiff's workload after she complained of sexual harassment in a complaint that included Morales as a person with authority who failed to take remedial action.  Such an "objectively tangible harm" constitutes an adverse employment action.  See Colon-Fontanez, 660 F.3d at 42.

## 2.  Transfer to ID Card Section

Plaintiff alleges Morales retaliated against her by transferring her to the ID card section on August 24, 2009.  (Docket No. 45 at 20-21.)  The Supreme Court has held a material adverse employment action can occur where an employee is transferred out of a job that is considered objectively better.  Burlington N., 548 U.S. at 71. Yet, the Court advised that not all reassignments are considered adverse employment actions; instead, the court must assess in an objective manner "the circumstances of the particular case."  Id.  A reassignment without salary or work hour

Civil No. 13-1507 (GAG)

changes may, in some circumstances, be an adverse employment action if it constitutes a demotion evidenced by "a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation."[9]   Kocsis v. Multi-Care Management, Inc., 97 F.3d 876, 886 (6th Cir. 1996).

Whether Plaintiff's reassignment to the ID card section is an adverse employment action depends on the circumstances surrounding the transfer.  Plaintiff contends the move was retaliatory because Morales knew that Plaintiff had had issues with the employees in that section before, while implementing the Lean Six Sigma project.  (Docket No. 43 at 42 ¶ 155-156.)  Morales admitted that she knew that in that section the employees in that section were negative towards Plaintiff.  Id. at 43 ¶ 161.  Plaintiff offered evidence that in the ID Card Section she would perform the functions of an Office Automation Assistant, the first position she held when she started working for the Federal Government in 1995.  Id. at 42 ¶ 159.  Importantly, Morales even admitted that this move would not be beneficial to Plaintiff's career.  Id. ¶ 157.  Nonetheless, Morales characterizes the transfer as a "temporary move" and argues that there were no negative implications on Plaintiff's career because there was no decrease in grade or loss in pay or benefits. (Docket No. 54 ¶ 158.)  Morales also contends even though she was aware the employees of the ID Card Section were unhappy with Lean Six Sigma, she understood the complaints were more about the project rather than Plaintiff.  (Docket No. 39 ¶ 61.)

---

[9] See, e.g., Burlington N., 548 U.S. 53 at 71 (establishing that an employee's transfer from forklift operator to a "dirtier," more arduous and less prestigious position, even within the same job classification, constituted an adverse employment action); Billings, 515 F.3d at 53 (finding a showing of loss of prestige could constitute objective evidence contrasting employee's former and current jobs to allow the jury to find a materially adverse employment action); Melendez-Arroyo v. Cutler-Hammer de P.R. Co., Inc., 273 F.3d 30, 36 (1st Cir. 2001) (finding adverse employment action for employee that was taken from a position of substantial responsibility to one where she was given menial tasks, even despite a small pay increase); Rodriguez v. Bd. of Educ., 620 F.2d 362, 366 (2nd Cir. 1980) (finding an adverse employment action where the transfer would have radically changed the nature of plaintiff's work and rendered useless her 20 years of experience and specialized study).

Civil No. 13-1507 (GAG)

However, a reasonable juror could find the ID Card Section position was "less prestigious" and it required less experience and fewer qualifications than her prior position, given that Plaintiff last held a similar position almost twenty years ago.  See Burlington N., 548 U.S. at 71; see also Rodriguez, 620 F.2d at 366.  Defendants admitted that Morales knew this would not be a beneficial move for Plaintiff's career and that she would be met with hostility by the employees there, but transferred her anyway.

### 3.   Transfer to the RSO

Plaintiff claims she suffered an adverse employment action as a consequence of her EEO complaint against Comas, when she was immediately and involuntarily transferred to a position at the RSO, and was never relocated back to her position at the DHR as she had been promised by management.  (Docket No. 43 at 51 ¶ 210-212.)  Plaintiff asserts she remained in that temporary position "basically just being in the office for approximately one year," without any possibility of advancement.  (Docket No. 45 at 23.)  However, Plaintiff has not established that her transfer to the RSO was an adverse employment action.  Unlike her transfer to the ID Card section, here, Plaintiff failed to provide any evidence that her position at the RSO was of "less prestige," had a less distinguished title, or in any way constituted a demotion.  Defendants assert there was no change in grade or qualifications, and she was given a 5% raise in pay.  (Docket Nos. 51 at 9; 51-4 at 1.)  Even accepting that Plaintiff was moved to the RSO involuntarily, her subjective feelings of disappointment cannot be considered by this Court when determining whether an adverse employment action occurred.  See Marrero, 304 F.3d at 25 ("a transfer or reassignment that involves only minor changes in working conditions" is not actionable, even if it causes the plaintiff to feel "stigmatized and punished.").  Thus, Plaintiff's transfer to the RSO does not constitute an adverse employment action.

Civil No. 13-1507 (GAG)

### 4.   Non-Selection G6/G7 Managerial Support Technician Position:

Plaintiff claims that the decision to not select Plaintiff for a G6/G7 Managerial Support Technician position was in retaliation for her previous EEO activity.  (Docket No. 45 at 23-25.)

A failure to hire can be an "adverse employment action" for the purposes of a Title VII retaliation claim.  See Velez v. Janssen Ortho, LLC, 467 F.3d 802 (1st Cir. 2006).  To show that a failure to hire is an adverse employment action, a plaintiff must show that: "(1) she applied for a particular position (2) which was vacant and (3) for which she was qualified," and (4) "that she was not hired for that position."  Id. at 803.  Establishing an "adverse employment action" is part of Plaintiff's prima facie case, so the Plaintiff "has the burden of showing the [ ] aforementioned factors from Velez."  Sanchez-Rodriguez v. AT&T Mobility Puerto Rico, Inc., 673 F.3d 1, 14 (1st Cir. 2012).

In the present case, Plaintiff presented uncontested evidence that before she complained of sexual harassment to the EEO, Morales unsuccessfully attempted to upgrade the GS classification of Plaintiff's position to benefit her.  (Docket Nos. 43 at 62 ¶ 275; 54 ¶ 275.)  Plaintiff presented evidence that Morales eventually created the new position as a G7 classification, and after learning of this vacancy, Plaintiff applied.  (Docket Nos. 43 at 51 ¶ 213; 54 ¶ 213).  Though Plaintiff was considered for the position, it was ultimately given to Ricardo Villalba.  (Docket Nos. 43 at 51 ¶ 247; 54 ¶ 247.)  Plaintiff provided evidence that she was qualified for the position because it was modeled after her previous position as a Management Support Technician and she had excellent performance evaluations in all her years of service.  (Docket No. 43 at 53 ¶ 225.)  Thus, a reasonable jury could infer that not choosing Plaintiff for a position which she was qualified for could preclude a reasonable person from filing sexual harassment complaints against her employer.

Civil No. 13-1507 (GAG)

A review of the evidence presented by Plaintiff, viewed in the light most favorable to her, shows that Plaintiff could have been subjected to several adverse employment actions, and thus, Plaintiff has established a prima facie case of retaliation.

### ii.  Legitimate, Non-discriminatory Reasons and Pretext for Retaliation

Because Plaintiff has stated a prima facie case, the burden shifts to Defendants to articulate a legitimate, nondiscriminatory reason for the adverse employment actions taken against Plaintiff. See Wright, 352 F.3d at 478 (citations omitted).  The ultimate burden then falls on Plaintiff to show that Defendants' articulated reason was mere pretext. Id.  Still, "on summary judgment, the need to order the presentation of proof is largely obviated, and a court may often dispense with strict attention to the burden-shifting framework, focusing instead on whether the evidence as a whole is sufficient to make out a question for a fact-finder as to pretext and discriminatory animus." Fennell, 83 F.3d at 535.

Plaintiff has provided factual evidence from which a reasonable juror could conclude that Defendants' real reason to undertake such employment action was retaliation.   Defendants claim Morales did not retaliate or discriminate against Plaintiff by giving her the "cold shoulder" or reassigning her job duties, and that she simply needed Plaintiff to focus on the high priority Lean Six Sigma project.  (Docket No. 54 ¶ 65.)  However, Morales conceded that she became more "guarded" with Plaintiff right after Plaintiff filed her EEO complaint naming Morales as a responsible management official who failed to take prompt and appropriate action. Id. ¶ 49. Morales also admitted that she gave Plaintiff a verbal counseling because Plaintiff had a change of behavior, she was not the same secretary, and she "used to be perfect." (Docket Nos. 43 at 31 ¶ 86; 54 ¶ 86.)    Plaintiff provided evidence that even after July 31, 2009, when she finished the Lean

Civil No. 13-1507 (GAG)

1   Six Sigma project, she was not assigned any other duties, and Morales's silent treatment towards

2   Plaintiff continued.  (Docket No. 43 at 27 ¶ 56-57.)

3          Defendants contend that Plaintiff was reassigned to the ID Card Section due to the pending

4   loss of two contractors and the retirement of two GS employees.  (Docket No. 39 ¶ 59.) However,

5   Plaintiff provided evidence that Morales knew employees at the ID Card Section were unhappy

6   with Plaintiff, and that Morales admitted this move would not benefit her career.  (Docket No. 43

7   at 42 ¶ 157.)  Plaintiff also provided evidence that there were other candidates who could have

8   been detailed to the ID Card section, who had prior experience there.  (Docket No. 43 at 42 ¶ 158.)

9          Defendants maintain that Plaintiff's activity did not affect Morales decision to hire Villalba

10  to the position of Management Support Technician as a G7.  (Docket No. 39 at 15.)  Defendants

11  claim that contrary to Plaintiff's belief, the new position was not the same position that Plaintiff

12  previously held, and instead had more responsibilities that she had no experience with.  Id.  Still,

13  Plaintiff offered evidence that the selection process was not blind, and that both Morales and

14  Albert Orellana, the other hiring panel member, knew the names of the candidates who applied for

15  the position, and which application belonged to Plaintiff.  (Docket No. 43 at 64 ¶¶ 284-85.)

16  Additionally, Plaintiff presented evidence that once she filed her EEO Complaint, her duties in the

17  Management Support position at the DHR were slowly delegated to Villalba, who ultimately was

18  selected for the G7 position.  (Docket No. 43 at 53 ¶ 223.)   Plaintiff presented evidence that she

19  had previously trained Villalba, and at one point Villalba was Plaintiff's assistant at the DHR.

20  (Docket No. 43 at 57 ¶ 249.)  Furthermore, Plaintiff presented evidence that Villalba use to work

21  as a mail assistant at the Mailing Distribution, while she had experience as a Management Support

22  Technician.  Id. at 53-54 ¶¶ 225-226.

23

24

Civil No. 13-1507 (GAG)

Thus, Plaintiff has pointed the Court to specific facts that support an inference that unlawful retaliation played a part in Defendants' employment actions. Because Plaintiff established genuine issues of fact regarding Defendants' legitimate business reasons for taking adverse employment actions, and that these actions could have been taken in retaliation for reporting sexual harassment, the Court **DENIES** Defendants' Motion for Summary Judgment as to Plaintiff's retaliation claim.

**V.    Conclusion**

For the reasons stated above, Defendants' Motion to Dismiss Plaintiff's claim for punitive damages is **GRANTED**; Defendants' Motion to Dismiss the 2013 sexual harassment and 2011 failure to appraise claims is **GRANTED**; and Defendants' Motion to Dismiss Plaintiff's claim of retaliatory transfer to the RSO is **DENIED**. (See Docket 38, 40.) Lastly, Defendants' Motion for Summary Judgment is **DENIED** in its entirety as to Plaintiff's retaliation and sexual harassment claims under Title VII. See id.

This case is hereby referred to Magistrate Judge Bruce McGiverin for the holding of a pre-trial/settlement conference. The parties shall file a *joint*, proposed pre-trial order on or before February 19, 2016. The parties shall engage in further, good-faith negotiations prior to the conference, as Judge McGiverin may issue any other settlement directives. The Court hopes that the instant ruling will aid the parties in reaching an acceptable compromise which will end this litigation.

**SO ORDERED.**

In San Juan, Puerto Rico this 20th day of January, 2016.

*s/ Gustavo A. Gelpí*
GUSTAVO A. GELPI
United States District Judge